**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**ALORA S. HAMPTON,**

      **Plaintiff,**

v.                                                                              **Case No.: 1:14-cv-24505**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently before the Court are Plaintiff's Brief in Support of Complaint, wherein she requests that the Commissioner's decision be reversed and benefits be awarded to her, and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 14 & 15).

The undersigned has fully considered the evidence and the arguments of counsel.

1

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's motion for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On April 13, 2011, Plaintiff Alora S. Hampton ("Claimant") filed applications for DIB and SSI alleging a disability onset date of February 1, 2007, (Tr. at 224, 228), due to "diabetes, neuropathy, depression, high blood pressure, overactive bladder, brittle bones, [and] back problems." (Tr. at 310). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 156, 164). Claimant filed a request for an administrative hearing, (Tr. at 178), which was held on April 17, 2013, before the Honorable Benjamin R. McMillion, Administrative Law Judge ("ALJ"). (Tr. at 65-101). By written decision dated May 8, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 44-58). The ALJ's decision became the final decision of the Commissioner on June 24, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Complaint, (ECF No. 14), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15), to which Claimant filed a responsive brief, (ECF No. 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 46 years old at the time that she filed the applications for DIB and SSI, and 48 years old on the date of the ALJ's decision. (Tr. at 58, 224, 228). She completed the tenth or eleventh grade and communicates in English. (Tr. at 71, 309, 311). Claimant has previously worked as a housekeeper/janitor, fabricator, waitress, cashier at a convenience store, warehouse loader, and dishwasher. (Tr. at 56, 71-73, 267-71, 311).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1

3

to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.*

§§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance benefits through December 31, 2011. (Tr. at 46, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since February 1, 2007, the alleged disability onset date. (Tr. at 46, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "chronic back pain; diabetes mellitus; peripheral neuropathy; carpal tunnel syndrome, status-post right release surgery; degenerative joint disease of the knees; anxiety disorder; borderline intellectual functioning; obesity; and depressive disorder." (Tr. at 46-47, Finding No. 3). The ALJ considered Claimant's other alleged impairments, but found that those impairments were non-severe or not medically determinable. (Tr. at 47).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 47-48, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant cannot climb ladders, ropes, and scaffolds. She can occasionally kneel, crawl, crouch, stoop, balance, or climb ramps and stairs. She can occasionally finger. She should avoid concentrated exposure to extreme heat and cold, vibration, fumes, odors, dusts, gases, hazards, and poor ventilation. The claimant is limited to performing 1 to 2-step job instructions.

(Tr. at 48-56, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of her past relevant work. (Tr. at 56, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 56-57, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1964, and was defined as a younger individual age 18-49 on the alleged

disability onset date; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 56, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a packer, inspector, or mail clerk at the light exertional level. (Tr. at 56-57, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 57, Finding No. 11).

## IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises four challenges to the Commissioner's decision. The first two challenges relate to the ALJ's evaluation of medical source opinions. First, Claimant argues that the ALJ erred in his evaluation of the medical opinions provided by Claimant's treating podiatrist, Lenord S. Horwitz, DPM; her treating psychiatrist, Riaz U. Riaz, M.D.; and an examining psychologist, L. Andrew Steward, Ph.D. (ECF No. 14 at 4-12). With respect to Dr. Horwitz, Claimant states that he diagnosed her with plantar fasciitis in both feet, osteoarthritis degenerative joint disease of both feet and ankles, diabetes with arthritic and neurological manifestations, diabetic polyneuropathy, Morton's neuroma, and chronic foot and ankle instability caused by ligament laxity. Dr. Horwitz then treated her for these conditions for a two-year period. (*Id.* at 8). Based upon their longstanding treatment relationship, Dr. Horwitz opined that Claimant had an unstable gait caused by ligament laxity, which would affect her ability to work. (*Id.* at 9; Tr. at 746). She contends that the ALJ erred in assigning little weight to Dr. Horwitz's

opinion based on records from other treating physicians and without citing those treatment notes from Dr. Horwitz that purportedly conflicted with his opinion. (ECF No. 14 at 9). Furthermore, she asserts that the ALJ failed to weigh the opinion in accord with 20 C.F.R. § 404.1527(d)(2).[1] (*Id.*)

As to Dr. Riaz, Claimant asserts that Dr. Riaz had treated her for more than a year for major depressive disorder and panic disorder. (*Id.* at 4). Dr. Riaz opined that Claimant experienced marked limitations in concentration, interacting with others, and reacting appropriately in a work setting. (*Id.* at 5). Dr. Riaz also concluded that Claimant would be absent from work at least three times each month due to her mental impairments. (*Id.*) Claimant contends that the ALJ erred in assigning little weight to Dr. Riaz's opinion, arguing that the ALJ neglected "to provide significant, specific examples to support his rationale," failed to evaluate the opinion pursuant to 20 C.F.R. § 404.1527(d)(2), and improperly discounted the opinion based on its checklist format.[2] (*Id.* at 6-8).

In regard to Dr. Steward, Claimant notes that she was referred to Dr. Steward for a psychological evaluation by her counsel. (*Id.* at 10). Dr. Steward diagnosed her with major depressive disorder, generalized anxiety disorder, and borderline intellectual functioning. (*Id.*) He opined that Claimant was disabled due to her physical and mental impairments. (*Id.* at 10-11). Claimant insists that the ALJ assigned little weight to Dr. Steward's opinion "solely because he personally disagreed with it," and the ALJ failed to cite any evidence contrary to Dr. Steward's findings and conclusions. (*Id.* at 11-12). Claimant insists that the ALJ was likewise incorrect when he rejected Dr. Steward's

---

[1] 20 C.F.R. § 404.1527(d)(2) relates to the evaluation of medical source opinions on issues reserved to the Commissioner.

[2] Given the context of Claimant's argument, it appears she meant to cite 20 C.F.R. § 404.1527(c)(2).

finding that Claimant had problems with social interaction, providing as his reason that Claimant had never reported difficulty with social interaction to any other professional. (*Id.* at 12). Claimant argues that Dr. Riaz recorded Claimant's frequent panic attacks in crowds, and a state agency medical consultant also opined that Claimant should be restricted to employment with low social demands. (*Id.*)

In her second challenge, Claimant avers that the ALJ improperly assigned some weight to the opinions of the state agency consultants when those opinions were entitled to no weight. (*Id.* at 12). In relation to the physical RFC opinion provided by state agency consultant Fulvio Franyutti, M.D., Claimant emphasizes that the opinion was formed in August 2011, without the benefit of Dr. Horwitz's complete treatment records. (*Id.*) With respect to the June 2011 mental RFC opinion provided by state agency consultant Bob Marinelli, Ed.D., Claimant asserts that Dr. Marinelli failed to list the medical records he considered in forming his opinion. (*Id.* at 13). Moreover, Claimant states that she had not yet received psychiatric treatment from Dr. Riaz at the time Dr. Marinelli formed his opinion. (*Id.*)

In her third challenge, Claimant argues that the ALJ's credibility analysis is flawed because the ALJ "misunderstood or misconstrued evidence" and used that evidence to "attack" her credibility. (*Id.* at 14). Claimant maintains that the ALJ "cherry-picked among reports looking for potential inconsistencies" to discount Claimant's credibility. (*Id.* at 16). In addition, Claimant contends that instead of questioning her about any alleged inconsistencies in her statements, the ALJ improperly made and relied on assumptions about those statements in assessing Claimant's credibility. (*Id.* at 16-17). Finally, in her fourth challenge, Claimant avers that the ALJ used his own non-expert knowledge in arriving at the RFC finding and incorporated his personal opinions

into Claimant's RFC rather than the opinions of treating, examining, and non-examining medical sources. (*Id.* at 17-18).

In response, the Commissioner argues that substantial evidence supports the ALJ's decision to discount the opinions of Dr. Horwitz, Dr. Riaz, and Dr. Steward. (ECF No. 15 at 15). In relation to Dr. Horwitz's opinion, the Commissioner asserts that Claimant reported only moderate or mild pain to Dr. Horwitz and that her pain improved with treatment. (*Id.* at 16). The Commissioner points to certain appointments where Claimant indicated that her condition was "good" or that the treatment worked "great" and "helped appreciably." (*Id.*) In addition, the Commissioner asserts that Dr. Horwitz never limited Claimant's standing or walking and often described Claimant as ambulatory. (*Id.* at 17). Furthermore, the Commissioner avers that the ALJ properly evaluated Dr. Horwitz's opinion given that other physicians opined Claimant's gait was normal, Claimant's daily activities were inconsistent with an inability to stand and walk, and Dr. Horwitz's opinion was inconsistent with the opinion of Dr. Franyutti and state agency consultant Rafael A. Gomez, M.D. (*Id.*)

In relation to Dr. Riaz's opinion, the Commissioner insists that the opinion was entitled to little weight because it was inconsistent with the medical evidence, including Claimant's GAF score of fifty-five in November 2011, her report that her crying spells had ceased in August 2012, and Dr. Riaz's note that Claimant was doing fairly well in December 2012. (*Id.* at 18). In addition, the Commissioner argues that Dr. Riaz "offered a check-the-box style opinion with little supporting explanation." (*Id.* at 19). The Commissioner adds that Dr. Riaz's opinion was inconsistent with Claimant's activities of daily living and the opinions of Dr. Marinelli and state agency consultant Chester Frethiem, Psy.D. (*Id.*) The Commissioner argues likewise that Dr. Steward's opinion was

entitled to little weight for many of the same reasons. (*Id.* at 18-19). She stresses that Dr. Steward was not a treating physician and that his opinion as to disability invaded the province of the Commissioner. (*Id.*) Moreover, although Dr. Steward opined that Claimant had difficulty interacting with others, the Commissioner maintains that Claimant never reported social difficulty to other treaters; on the contrary, Claimant indicated in a disability report that she did not have problems getting along with others. (*Id.* at 18). With respect to the ALJ's evaluation of the state agency consultants' opinions, the Commissioner argues that the regulations impose no limit on how much time may pass between the issuance of a consultant's opinion and the ALJ's decision relying on that opinion. (*Id.* at 20).

With regard to Claimant's third challenge, the Commissioner counters that the ALJ's finding that Claimant was not entirely credible is supported by substantial evidence. (*Id.* at 12). By way of example, the Commissioner cites a number of purported inconsistencies in the record: (1) Claimant's conflicting statements as to why she stopped working; (2) the incompatibility of Claimant's reported daily activities with her alleged disabling symptoms and limitations; (3) Claimant's failure to consistently seek treatment for some of her conditions; (4) Claimant's routine and conservative treatment when compared to her description of disabling symptoms; and (5) Claimant's failure to always follow medical advice. (*Id.* at 12-15). Finally, as to Claimant's fourth challenge, the Commissioner asserts that the RFC finding is an administrative finding, not a medical opinion, and therefore, the ALJ's RFC finding did not have to mirror the opinion of any physician. (*Id.* at 11). To the extent that the ALJ did not include certain limitations in the RFC finding that were contained in the opinions of the state agency

consultants, the Commissioner contends that the ALJ was not required to do so. (*Id.* at 19 n.3).

In her reply brief, Claimant argues that the Commissioner uses *post hoc* rationalizations and relies on evidence not cited by the ALJ. (ECF No. 16 at 2-3). In addition, Claimant asserts that the Commissioner neglected to adequately respond to her arguments that the ALJ erred in assigning any weight to the opinions of the state agency consultants and that the ALJ's credibility analysis is deficient. (*Id.*) Finally, Claimant acknowledges that "it is unnecessary for a physician to have made a particular finding corresponding to the ALJ's RFC" and "it is not necessary that there be an expert opinion as to the level of work an individual can perform," but contends that the ALJ's RFC finding in this case lacked any medical basis. (*Id.* at 3-4).

## V.   Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

### 1. Lenord S. Horwitz, DPM

On July 15, 2010, Claimant began treatment with Lenord S. Horwitz, DPM, for complaints of numbness, burning, pain, and coldness in both feet. (Tr. at 505-10). Claimant visited Dr. Horwitz approximately fifty times between July 2010 and March 2013. (Tr. at 368-98, 505-629, 634-37, 660-76, 724-43, 746-47, 791-809, 811-20, 832-35, 845-47). At her initial visit, Claimant complained that for the previous five years she had experienced tingling, burning, numbness, coldness, and pain in her feet along with foot and leg muscle cramps. (Tr. at 505). She also reported that she had "two slipped

discs" in her back and was numb from her knees down. (*Id.*) She described her foot pain as moderate, but claimed that her foot symptoms interfered with her daily routine. (*Id.*) Claimant further indicated that the pain radiated into both of her legs and her back; however, she was ambulatory. (*Id.*) Claimant stated that self-care aggravated her symptoms. (*Id.*) A review of systems was positive for trouble sleeping, diabetes, cold feet, difficulty exercising, high blood pressure, and burning pain. (Tr. at 506).

Upon examination, Dr. Horwitz observed that Claimant's touch, proprioception, and protective pedal sensations were within normal limits. (Tr. at 506). The pin prick and light touch sensations were diminished to absent; however, all deep reflexes were within normal limits. (*Id.*) Examination of the L5-S2 dermatome showed light touch sensation, vibration sensation, and pin prick sensation were decreased. (*Id.*) Dr. Horwitz believed that Claimant exhibited a positive Tinel's sign and opined that her pain was the result of diabetic neuropathy and the degenerative process on the C-fibers. (*Id.*) He found Claimant's coordination and balance to be fair. (*Id.*) Examination of the C-fiber reflexes as well as touch and protective sensations were not within normal limits. (*Id.*) Touching Claimant's skin revealed lack of sensation and significantly decreased to absent sensory perception under the plantar metatarsal areas, which Dr. Horwitz concluded was an obvious sensory deficit. (*Id.*) A peripheral vascular examination revealed that Claimant's anterior and posterior tibial pedal pulses were palpable, but decreased, with fair capillary refill time. (Tr. at 507). Dr. Horwitz found the capillary fill time was not within normal limits and was diminished with evidence of capillary fragility. (*Id.*) Dr. Horwitz also observed pedal edema and venous congestion in both legs. (*Id.*) Even though an Arterial Doppler Study showed no evidence of arterial occlusion of the anterior tibial or the posterior tibial artery, Dr. Horwitz believed that

13

Claimant had diminished peripheral circulation secondary to diabetic neuropathic C-fibers. (*Id.*) Dr. Horwitz noted evidence of arthritic joints, bone deformity, dorsal midtarsal exostosis, instability, stiffness, and tenderness in both feet. (*Id.*) A capsular examination of both the tarsal-metatarsal and midtarsal joints revealed limited and painful range of motion. (*Id.*) Dr. Horwitz also performed a lumbar stability examination of the back, which was found to be within normal limits. (*Id.*) Dr. Horwitz found that Claimant's shoes contained shoe plates that were not balanced or adequate to support her body, which caused her feet and her shoes to be unstable when walking. (Tr. at 508). An x-ray of Claimant's right ankle revealed soft tissue edema, normal anatomy, and no frank fracture or tumor. (*Id.*) An x-ray of the right foot showed the calcaneal angle was less than eighteen degrees and the talo-calcaneal angle was between six and eleven degrees causing talo-navicular fault. (*Id.*) Claimant's bone density appeared to be within normal limits. (*Id.*) The joint spaces in Claimant's right foot showed narrowing, which was consistent with degenerative joint disease. (*Id.*) Dr. Horwitz further observed a Chopart joint subluxation that could be secondary to ligament laxity or arthritis. (*Id.*) Abnormal soft tissue was seen at the symptomatic site. (*Id.*)

Claimant was assessed with plantar fasciosis secondary to laxity of ligament in both feet, enthesopathy, myalgia and neuralgic pain, chronic foot instability due to ligament laxity, osteoarthrosis and degenerative joint disease localized to both feet, arthropathy of joints related to diabetes with neurological disorder, arteriosclerosis obliterans with claudication, Morton's neuroma (neurapraxia) of the interspace, diabetic polyneuropathy with loss of protective sensorium with painful peripheral diabetic neuropathy ("PPDN"), and diabetes mellitus with arthritic and neurological manifestations. (*Id.*) Claimant was advised to begin the use of B-complex vitamins for

treatment of neuralgic pain and was prescribed Neurontin for neurotrophic pain. (Tr. at 509). Dr. Horwitz stressed to Claimant the effects of diabetes, and he reviewed self-care and home management training with her. (*Id.*) Claimant was provided written instructions for the use of diabetic shoes and orthotics. (*Id.*) Dr. Horwitz recommended an aloe based ointment and wrap for her feet at night. (*Id.*) Claimant received nerve block injections in the lateral plantar and medial plantar nerves in both feet, which provided her with immediate relief. (*Id.*) In addition, Dr. Horwitz applied flexible taping to both feet for tendinosis of the plantar fascia and joint instability secondary to lax ligament structure. (*Id.*) Dr. Horwitz described Claimant's prognosis as fair. (Tr. at 510).

Claimant returned to Dr. Horwitz on July 22, 2010, reporting continued burning, swelling, tingling, and numbness in both feet as well as joint and muscle pain. (Tr. at 511). She informed Dr. Horwitz that the "shots and taping really helped," and she requested additional injections. (*Id.*) Dr. Horwitz noted that Claimant was ambulatory. (*Id.*) He advised her to consider the use of orthotics and orthopedic shoes and recommended physical therapy. (Tr. at 513). Claimant was further instructed to restrict her activities to those that produced minimal discomfort and begin using Flexeril. (*Id.*) She received nerve block injections to her feet, which relieved her pain, and flexible tape was applied to both feet. (Tr. at 513-14).

Claimant treated with Dr. Horwitz three times in August 2010. (Tr. at 515-26). On August 5, Claimant received supports and orthopedic shoes. (Tr. at 515). She informed Dr. Horwitz that she worked as a babysitter. (Tr. at 517). She reported doing better although her complaints of plantar tendinitis and mid-foot instability had not resolved. (Tr. at 515). She also indicated that her medications had eased her pain and helped her to sleep better. (Tr. at 517). Dr. Horwitz noted that the physical findings and symptoms

15

remained unchanged. (Tr. at 515). He recommended home exercises, (*id.*), and administered nerve block injections at Claimant's request. (Tr. at 517-18). On August 12, Claimant requested injections and asserted that the injections provided her temporary relief lasting approximately one week. (Tr. at 520). She also asked for a refill of Neurontin. (*Id.*) She informed Dr. Horwitz that her pain was improving. (*Id.*) Dr. Horwitz prescribed Voltaren and Emla. (Tr. at 522). On August 26, Claimant again requested "shots in her feet." (Tr. at 523). She reported it felt like she was dragging her feet when she walked and that she had issues with tripping. (*Id.*) She also reported pain with standing or walking. (*Id.*) Dr. Horwitz provided Claimant with nerve block injections, chronic pain counseling, and a prescription for Flexeril. (Tr. at 525).

Claimant visited Dr. Horwitz twice in September 2010, once in October, and twice in November 2010. (Tr. at 527-543). Claimant requested and received nerve block injections to her feet at all of those visits. (Tr. at 529, 532, 535-36, 538-39, 542). Dr. Horwitz recorded that Claimant's prognosis on September 8, 2010 was guarded; however, beginning at her visit on September 22, and continuing through November 17, 2010, Dr. Horwitz opined that Claimant's prognosis was good. (Tr. at 529, 532, 536, 539, 542).

Claimant returned to Dr. Horwitz on January 18, 2011. (Tr. at 368). Claimant indicated that her pain was improving and requested nerve block injections. (*Id.*) Dr. Horwitz observed that Claimant was ambulatory. (*Id.*) Claimant received nerve block injections, and Dr. Horwitz opined that her prognosis was fair. (Tr. at 370). Claimant again visited Dr. Horwitz on February 7, 2011. (Tr. at 371). She requested nerve block injections and medication refills. (*Id.*) She informed Dr. Horwitz that as long as she took her medicine and received shots to her feet, her feet were "fine." (*Id.*) Dr. Horwitz

recorded that Claimant continued to present the same physical findings and symptomatology. (Tr. at 372). Dr. Horwitz administered nerve block injections to her feet and diagnosed Claimant with lesion of plantar nerve secondary to diabetes, diabetic polyneuropathy with loss of protective sensorium with PPDN, and diabetes mellitus with arthritic and neurological manifestations. (Tr. at 372-73).

Claimant treated with Dr. Horwitz eighteen additional times in 2011. (Tr. at 375-81, 382-98, 574-611, 618-21). At each visit, Claimant requested and received nerve block injections to her feet. (Tr. at 375-76, 380, 382, 388, 391, 394-95, 575-76, 580, 584, 586-87, 590, 594, 597, 600, 604, 607, 610, 620). Throughout the months of February and March, Dr. Horwitz documented that Claimant continued to have a fair prognosis. (Tr. at 377, 380, 384). On April 14, 2011, Claimant returned for follow-up with Dr. Horowitz. (Tr. at 386). Claimant reported she was hospitalized in March due to numbness in her upper body. Dr. Horwitz found that Claimant's physical findings and symptomatology were unchanged, and both ankles were found to be unstable. (Tr. at 387). Dr. Horwitz downgraded Claimant's prognosis to poor. (Tr. at 388).

Claimant returned to Dr. Horwitz on May 3, 2011. (Tr. at 389-92). She complained of moderate pain in both feet and stated that she was there to get injections have her medications refilled. Dr. Horwitz complied with her requests, administering injections in her feet and providing her with prescription refills. He also measured her for orthopedic shoes. (Tr. at 391).

On June 22, 2011, Claimant visited Dr. Horwitz for follow-up. (Tr. at 578-81). Claimant reported that her last nerve block injections had relieved her pain for approximately two weeks. (Tr. at 578). She described her pain as moderate and reported that the use of orthopedic shoes and orthotics provided her with relief. (*Id.*) Dr. Horwitz

17

noted that Claimant was ambulatory. (*Id.*) He felt her prognosis was good. (Tr. at 580).

On July 13, 2011, Dr. Horowitz documented that Claimant remained ambulatory, but continued to complain of moderate pain. (Tr. at 582). Upon musculoskeletal examination, Dr. Horwitz noted mechanical stability since Claimant's last visit; however, her knees, ankles, and sinus tarsi showed no improvement, and Claimant's ligament integrity remained unchanged. (Tr. at 583). Dr. Horwitz opined that partial recovery was expected. (Tr. at 584).

When Claimant returned to Dr. Horwitz on September 14, 2011, she reported that her pain was improving and her prior treatment had helped appreciably. (Tr. at 595). She was ambulatory, and her musculoskeletal examination showed improvement. (Tr. at 595-96). Dr. Horwitz described her prognosis as good. (Tr. at 597). Claimant's prognosis remained good through September 28, 2011. (Tr. at 597, 600). Throughout October and November 2011, however, Claimant maintained only a fair prognosis. (Tr. at 604, 607, 611). On October 11, 2011, Dr. Horwitz recommended that Claimant see W. Azzo, M.D., for an orthopedic surgical consult. (Tr. at 603).

On December 5, 2011, Claimant saw Dr. Horwitz and continued to describe her pain as moderate. (Tr. at 618). She remained ambulatory, and Dr. Horwitz agreed to prescribe a low dose of hydrocodone for pain control and muscle spasm. (Tr. 618, 620). Claimant's prognosis was hopeful. (Tr. at 620).

Claimant treated with Dr. Horwitz in 2012 beginning on January 10 and continuing through December 10. (Tr. at 622-29, 634-37, 660-76, 724-43, 746-47, 791-815, 845-47). During this period, Claimant received nerve block injections in her feet at every appointment. (Tr. at 628, 636, 662, 666, 671, 675, 726, 729, 734, 739, 742, 795, 808, 813, 818). On January 10, 2012, Claimant specifically requested nerve block

injections, stating that she was not experiencing any itching or burning in her feet, but she felt like she was "carrying cinder blocks on them." (Tr. at 622). She described her pain as moderate, and Dr. Horwitz noted that Claimant remained ambulatory. (*Id.*) Dr. Horwitz recorded that a musculoskeletal examination showed improvement since Claimant's last visit, but she continued to experience ankle instability. (Tr. at 623). He diagnosed Claimant with tarsal tunnel syndrome; neurapraxia of the plantar nerve; Morton's neuroma of the interspace; plantar fasciitis/osis of both feet; myalgia and neuralgic pain (C-Fiber motivated); chronic foot and ankle instability; diabetic polyneuropathy with loss of protective sensorium with PPDN; diabetes mellitus with arthritic and neurological manifestations; and osteoarthritis, degenerative joint disease, localized. (*Id.*) Dr. Horwitz administered nerve block injections and prescribed an ankle and foot gauntlet to brace and support Claimant's weakened foot and ankle structure. (Tr. at 624). Claimant's prognosis was listed as hopeful. (*Id.*)

On February 22, 2012, Claimant informed Dr. Horwitz that her feet were "doing good," although she continued to have moderate pain. (Tr. at 634). Dr. Horwitz noted that Claimant was stable, and her prognosis remained hopeful. (Tr. at 635-36). In March 2012, Claimant again reported that her feet were "doing good," and her prognosis remained the same. (Tr. at 664, 666). On April 12, 2012, Claimant indicated that the nerve block injections worked so well that she felt like she could "run a marathon." (Tr. at 668).

On May 3, 2012, Claimant reported to Dr. Horwitz that she had swelling, burning, and tingling in her feet along with muscle cramps and low back pain. (Tr. at 673). She described her pain as "not really bad," but "aggravating." (*Id.*) On May 30, 2012, Claimant called Dr. Horwitz to notify him that she was in North Carolina, and she

requested that her medication refills be sent to her there. (Tr. at 728).

On July 27, 2012, Claimant informed Dr. Horwitz that her foot symptoms varied with her activity level. (Tr. at 729). Claimant also indicated that performing self-care activities increased her pain. (*Id.*) During a musculoskeletal examination, Dr. Horwitz observed mechanical stability since Claimant's last visit. (Tr. at 730).

On August 9, 2012, Claimant stated on follow-up with Dr. Horwitz that injections helped "so much," and Dr. Horwitz again recorded mechanical stability since Claimant's last visit. (Tr. at 732-33). On August 23, 2012, Claimant reported experiencing burning, swelling, tingling, numbness, joint pain, and muscle pain. (Tr. at 737). Dr. Horwitz noted mechanical stability and opined that Claimant's prognosis was hopeful. (Tr. at 738-39).

At September 12, September 27, October 3, and October 9, 2012 visits with Dr. Horwitz, Claimant described her foot pain as mild. (Tr. at 798, 802, 806, 811). At each of those visits, Dr. Horwitz noted that Claimant exhibited mechanical stability, and that her coordination and balance were fair. (Tr. at 799, 803, 807, 812). Claimant was also observed to be ambulatory on October 3 and October 9, 2012. (Tr. at 798, 802).

On December 10, 2012, Claimant requested that Dr. Horwitz write a prescription for Motrin, as it had helped with her pain in the past. (Tr. at 794). Upon examination, mechanical stability since Claimant's last visit was evident. (Tr. at 795). However, Dr. Horwitz noted that Claimant still experienced instability in both knees and ankles. (*Id.*) Use of an ankle brace aided Claimant's stability. (*Id.*) Both of Claimant's sinus tarsi joints showed instability at mid-stance on weight bearing and laxity with increased joint play on and off of weight bearings. (*Id.*) Dr. Horwitz noted swelling of both Chopart-Lisfranc joints with interstitial edema in the Chopart and Lisfranc joints. (*Id.*) Although

20

there was pain at the tendo-periosteal junction and muscle pain at the end-point of the range of motion, Dr. Horwitz opined that Claimant's condition was stable with her present course of treatment. (*Id.*) As to ligament integrity of the joints of both sinus tarsi and feet, the joints showed instability and pressure sensitivity with hypermobility. (*Id.*) To stabilize Claimant's feet and ankles, Dr. Horwitz ordered custom shoe inserts and orthopedic shoes. (*Id.*) Claimant's prognosis was described as hopeful, and she was prescribed Motrin 800 mg, in addition to Ultram, Flexeril, and Neurontin. (Tr. at 796-97).

Claimant returned to Dr. Horwitz on March 11, 2013 for persistent joint and muscle pain in her feet. (Tr. at 832). She reported that her feet felt "a little heavy," and continued to describe the pain as moderate. (*Id.*) Dr. Horwitz recorded that Claimant exhibited mechanical stability since her last office visit, but she continued to have knee, foot, and ankle instability. (Tr. at 833-34). He recommended that Claimant elevate her legs for twenty-five minutes every other hour, use a walker full-time, avoid cold weather exposure, and observe diet and complementary medicine modification. (Tr. at 834). Dr. Horwitz opined that Claimant's prognosis was hopeful. (*Id.*) He prescribed Ultram, Neurontin, Motrin 800 mg, and Flexeril. (Tr. at 835).

### 2. Southern Highlands Community Mental Health Center

Claimant presented to Southern Highlands Community Mental Health Center ("SHCMHC") on November 2, 2011. (Tr. at 497-502). She stated that she was severely depressed with constant crying episodes as well as constant eating and sleeping. (Tr. at 498). She reported gaining seventy-five pounds in the year prior to her visit. (*Id.*) She informed Tina Borich, M.A., that she was diagnosed with depression several years prior when her father died. (*Id.*) She did not think the Lexapro she had been prescribed was

helping. (*Id.*) Claimant also reported experiencing panic attacks and felt that her prescribed .25 mg dosage of Xanax was not enough to alleviate her symptoms. (*Id.*) She complained of mood swings and said she did not exercise "because she is lazy." (*Id.*) Her other medications at that time included Trazodone, Neurontin, Diovan, Ditropan, Fosamax, Fioricet, Questran Light, Janumet, Humalog, Byetta, Flexeril, Lidocaine, and Prilocaine. (Tr. at 499). Claimant reported that she had no friends or support; however, she said she was taking care of two children belonging to a friend. (Tr. at 499). She attended church, but stopped going due to the preacher. (*Id.*) As for activities, Claimant enjoyed crocheting blankets. (*Id.*) Claimant informed Ms. Borich that she was trying to obtain disability due to having no mobility in her legs. (*Id.*) Ms. Borich observed that Claimant had a broad affect, at times laughing then crying. (*Id.*) Claimant also appeared to be on the verge of a panic attack during the evaluation. (*Id.*) She was oriented with normal speech and thought content. (*Id.*) Ms. Borich recorded that Claimant's judgment and insight were good. (*Id.*) Claimant reported problems with her short-term memory, but she was able to explain her situation in detail. (*Id.*) She denied having any suicidal ideations, delusions, or hallucinations. (Tr. at 500). In addition, Claimant denied any problems with performing daily tasks due to her mental health. (*Id.*) Ms. Borich assigned a Global Assessment of Functioning ("GAF") score of fifty-five.[3] (Tr. at 500). Claimant was diagnosed with "major depressive disorder, recurrent, severe without

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. text rev. 2000) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

psychotic features (rule out panic disorder)." (*Id.*) Ms. Borich noted that Claimant would begin psychiatric services with Riaz U. Riaz, M.D., but she declined counseling at that time. (*Id.*)

Claimant returned to SHCMHC on November 14, 2011 to see Dr. Riaz. (Tr. at 496). At that time, she appeared cooperative. (*Id.*) Her mood was depressed and anxious, and her affect was anxious. (*Id.*) Claimant's energy was fair, but she did report inadequate sleep with multiple awakenings at night. (*Id.*) Dr. Riaz noted that Claimant's recent and remote memory was fair. (*Id.*) He prescribed Prozac, Strattera, and Trazodone. (*Id.*)

Claimant visited SHCMHC on July 11, 2012 reporting depression and panic attacks. (Tr. at 707). She also informed Dr. Riaz that her medication was not helping. (*Id.*) Dr. Riaz noted that Claimant was cooperative. (*Id.*) Her mood was depressed and anxious, and her affect was anxious. (*Id.*) Her energy level was fair with good appetite and adequate sleep. (*Id.*) Dr. Riaz recorded that Claimant demonstrated fair memory, insight, and judgment. (*Id.*) Claimant's thought content and stream of thought were observed to be normal and appropriate. (*Id.*) Dr. Riaz prescribed Paxil, Effexor, Vistaril, and Trazodone. (*Id.*)

Claimant again visited SHCMHC on August 8, 2012. (Tr. at 709). Claimant reported that she was not crying anymore and that her sleep was adequate. (*Id.*) Upon mental status examination, Claimant's mood appeared depressed and anxious, and her affect was anxious. (*Id.*) Claimant's insight, judgment, memory, and stream of thought were all fair or good. (*Id.*) Claimant continued with a diagnosis of major depressive disorder and panic disorder. (*Id.*) Her medication regimen remained unchanged. (*Id.*)

On December 11, 2012, Claimant returned to SHCMHC. (Tr. at 826). Dr. Riaz

noted that Claimant was doing fairly well. (*Id.*) Claimant interacted well and was cooperative, with appropriate speech. (*Id.*) She presented with an anxious mood and affect. (*Id.*) Claimant reported adequate sleep and fair appetite. (*Id.*) Dr. Riaz observed that Claimant exhibited a normal stream of thought with fair insight and judgment. (*Id.*) Her diagnosis and medication regimen remained unchanged. (*Id.*)

Claimant was seen at SHCMHC on March 5, 2013. (Tr. at 842). Dr. Riaz observed that Claimant's mood and affect were anxious. (*Id.*) Claimant's energy, insight, judgment, recent memory, and remote memory were all fair or good. (*Id.*) Her stream of thought was normal. (*Id.*) Claimant's medications remained the same. (*Id.*)

### 3. Other Treatment Records

On June 8, 2007, Claimant presented to Carol Asbury, M.D., at Bluewell Family Clinic, for the purpose of a West Virginia Department of Health and Human Resources examination. (Tr. at 341-42). Claimant's employment as a cleaner for a physician's office ended several months prior due to Claimant's complaints of numbness above both knees down to her lower legs and into her feet. (Tr. at 341). She reported that these symptoms had resulted in problems walking, and that she tripped a good amount of the time. (*Id.*) She also reported painful, burning sensations in the lower part of both legs. (*Id.*) In addition, Claimant stated that she recently underwent an ultrasound of her liver due to increased liver function tests. (*Id.*) Claimant denied experiencing back pain and bowel or bladder symptoms. (*Id.*) Psychologically, Claimant reported that her father had passed away earlier in the year, and she was struggling with that in the form of some occasional depression, crying episodes, sleep issues, and weight gain. (*Id.*) Upon examination, Claimant appeared alert and oriented in no acute distress. (*Id.*) There were no obvious visible deformities to her lower extremities. (*Id.*) Claimant's knees revealed

full range of motion bilaterally, and no edema, popliteal cysts, or masses were observed. (*Id.*) Knee jerks were found to be 2+ and equal bilaterally. (*Id.*) However, sensation appeared grossly decreased below the knees on both lower extremities. (*Id.*) Claimant did have normal posterior tibial and dorsalis pedis pulses with no lower extremity edema. (*Id.*) Claimant's back appeared non-tender, and a straight leg raise was negative. (*Id.*) Claimant was able to flex normally at the waist, and her upper extremities exhibited full range of motion. (*Id.*) Dr. Asbury diagnosed Claimant with lower extremity numbness bilaterally, hypertension, elevated liver function tests, and possible depression. (*Id.*) Dr. Asbury recommended that Claimant be limited to light duty while undergoing evaluation for medical issues. (Tr. at 342). She also recommended considering a neurology referral for Claimant's complaints of numbness and that Claimant receive treatment for depression. (*Id.*)

On July 7, 2010, Claimant presented to Norman L. Siegel, M.D., complaining of lower left-sided pain. (Tr. at 405-06). He noted that Claimant smoked one pack of cigarettes per day and was advised to quit or cut down. (Tr. at 405). Claimant provided a prior medical history that included hypertension, Type II diabetes, depression, chronic back pain, and anemia. (Tr. at 406). Claimant complained of back and joint pain; joint swelling; muscle cramps, weakness, and stiffness; and arthritis. (*Id.*) She also reported experiencing tingling below the knees which, according to Claimant, was due to diabetic neuropathy and disc disease. (Tr. at 407). In addition, Claimant stated she experienced depression, anxiety, and memory loss, but she denied any mental disturbance, suicidal ideation, hallucination, or paranoia. (*Id.*) Upon examination, Dr. Siegel recorded that Claimant had a normal gait. (Tr. at 408). Her mood and affect were negative for depression, anxiety, or agitation. (*Id.*) Dr. Siegel found Claimant's judgment, insight,

recent memory, and remote memory to be intact. (*Id.*) He assessed Claimant with abdominal pain and instructed to take calcium and vitamin D daily. (*Id.*)

On September 21, 2010, Claimant treated with Kimberly Weatherly, FNP-C, at Bluefield Gastroenterology after being referred there by Sima Nourani Zenuz, M.D., for an evaluation of elevated liver function tests. (Tr. at 432-36). A review of systems was negative for muscular pain, weakness, and cramps; joint stiffness, pain, deformity, heat, and swelling; gait disorder; tingling, burning, or numbness; transient weakness in the extremities; and back pain. (Tr. at 435). Ms. Weatherly recorded that Claimant denied experiencing suicidal thoughts, depression, insomnia, anxiety, or panic attacks. (*Id.*) Upon physical examination, Claimant appeared alert and emotionally stable. (*Id.*) No edema or cyanosis of the extremities was observed. (Tr. at 436). Claimant returned to Bluefield Gastroenterology on November 4, 2010 and reported problems with depression, for which she was seeing Dr. Riaz.[4] (Tr. at 427). On examination, Claimant appeared emotionally stable and no gait disorder was noted. (Tr. at 430). Claimant again visited Bluefield Gastroenterology on November 30, 2010. (Tr. at 422). Ms. Weatherly noted that Claimant experienced no gait disorder and continued to complain of depression, but described Claimant as appearing emotionally stable. (Tr. at 425). Claimant was diagnosed with uncontrolled diabetes mellitus, elevated liver function tests, nausea, gastroesophageal reflux disease ("GERD"), and fatty liver. (*Id.*)

On March 15, 2011, Claimant presented to Bluefield Regional Medical Center with complaints of arm pain, hand numbness, and chest pain. (Tr. at 346). She also complained of depression and anxiety. (*Id.*) Claimant indicated that she used a cane

---

[4] The earliest treatment record from Dr. Riaz in the administrative record is from November 2011. (Tr. at 496).

intermittently to ambulate and that she was attempting to obtain disability benefits due to weakness. (Tr. at 347). On examination, no evidence of edema, cyanosis, or clubbing was found in Claimant's extremities. (*Id.*) Tests revealed that Claimant had uncontrolled diabetes as well as chronic elevated liver function studies. (Tr. at 350). A chest x-ray and Lexiscan stress test were both negative. (*Id.*) Claimant was diagnosed with atypical chest pain, stable hypertension, uncontrolled diabetes mellitus, tobacco use, dysesthesia of the bilateral hands, elevated liver function studies, obesity, and hyperlipidemia. (Tr. at 351). Claimant was advised to follow up in one week with Dr. Nourani Zenuz for diabetes treatment. (*Id.*) She was discharged in stable condition. (*Id.*)

On April 7, 2011, Dr. Nourani Zenuz referred Claimant to Khalid Razzaq, M.D., for nerve conduction and EMG study relating to her complaints of pain and numbness in her arms. (Tr. at 365). Dr. Razzaq concluded that the results indicated an abnormal study with evidence of bilateral ulnar neuropathy across the elbow (tardy ulnar neuropathy), moderate on the right and mild on the left. (Tr. at 366). Dr. Razzaq also noted evidence of mild bilateral median neuropathy at the wrist (carpal tunnel syndrome), right greater than left. (*Id.*) Dr. Razzaq recommended decompression or transposition surgery for the right ulnar neuropathy. (*Id.*)

Claimant presented to Dr. Nourani Zenuz on April 27, 2011 with complaints of right arm pain. (Tr. at 451). She was diagnosed with poorly controlled, but improving, diabetes; anxiety and depressive disorder; ulnar tunnel syndrome; and carpal tunnel syndrome. (*Id.*) She was given a referral to an orthopedic surgeon. (*Id.*)

Claimant visited Yogesh Chand, M.D., on May 31, 2011. (Tr. at 473). She complained of numbness and tingling in her right arm, eye problems, loss of bladder control, anxiety, difficulty swallowing, headaches, depression, and loss of balance. (Tr.

at 474). On examination, Claimant's mental status was clear. (Tr. at 473). She was oriented and coordinated with appropriate mood. (*Id.*) A straight leg-raising test was negative bilaterally, and a neurological examination of Claimant's legs was normal. (*Id.*) Claimant was diagnosed with carpal tunnel syndrome, advanced osteoarthritis, and obesity. (*Id.*)

On June 9, 2011, Claimant was seen at Bluefield Internal Medicine for the purpose of a disability evaluation. (Tr. at 453). She complained of diabetic neuropathy, nerve damage in both elbows, lack of mobility, and pain. (*Id.*) The examiner recorded that Claimant could sit for thirty minutes, and stand or walk for fifteen minutes. (*Id.*) Claimant had difficulty leaning forward and could not kneel. (*Id.*) Claimant reported that her knees buckled and she could only carry an eight pound bag of sugar or potatoes. (*Id.*) Claimant indicated that she did not drive, even as a passenger, due to panic attacks. (*Id.*) She also reported experiencing claustrophobia. (*Id.*) Claimant needed assistance to get up and down from the examination table. (Tr. at 454). On examination, no swelling, erythema, or increased warmth was observed in Claimant's musculoskeletal joints. (*Id.*) Claimant was found to have upper extremity strength at 4/5 bilaterally. (*Id.*)

Claimant returned to Dr. Chand on July 7, 2011, complaining of numbness in both arms from her elbows to her hands. (Tr. at 471). Claimant also reported experiencing pain and noted that her problems were worse when she used her hands. (*Id.*) She further indicated experiencing weakness, loss of bladder control, dizziness, anxiety, difficulty swallowing, depression, loss of balance, and circulation problems. (Tr. at 472).

On July 8, 2011, Kamalesh Patel, M.D., at Bluefield Gastroenterology was provided a Routine Abstract Form (Physical) by the West Virginia Disability

Determination Section. (Tr. at 417-21). The form was not completed because Claimant had not treated there since November 2010. (Tr. at 420). Ms. Weatherly noted on the form that she was not currently treating Claimant for any issue that would result in any disability. (*Id.*)

On July 15, 2011, Claimant underwent a medical epicondylectomy of the right elbow and an ulnar nerve transposition of the right elbow performed by Dr. Chand. (Tr. at 490-91). Claimant's post-operative diagnosis was ulnar nerve entrapment of the right elbow, medially. (Tr. at 490). She returned to Dr. Chand on July 21 for follow-up. (Tr. at 469). Claimant presented with appropriate mood, coordination, and orientation. (*Id.*) Straight leg-raising tests bilaterally were negative, and neurological examination of her legs was normal. (*Id.*) Claimant's gait was also observed to be within normal limits. (*Id.*) Claimant indicated that the numbness and tingling was much better in her right ulnar nerve. (Tr. at 470). Claimant again visited Dr. Chand on August 11, 2011 and reported occasional numbness and tingling. (Tr. at 468). She was assessed with ulnar nerve transposition and obesity. (Tr. at 467). Her treatment plan included physical therapy and Lortab. (*Id.*)

Claimant presented to the Physical Therapy Department of Princeton Community Hospital on August 21, 2011 for a physical therapy evaluation of the upper extremity. (Tr. at 477). Claimant indicated that her symptoms had improved following her recent operation. (*Id.*) The examiner recorded that Claimant was not functionally limited with sitting, standing, or ambulation, but she avoided lifting. (*Id.*)

Claimant returned to Bluefield Internal Medicine on August 25, 2011. (Tr. at 456-57). Her physical examination was unremarkable. (Tr. at 456). Claimant's gait and station were observed to be normal. (*Id.*) Claimant continued to complain of panic

attacks and depression. (Tr. at 457). She reported grieving over the loss of her grandson. (*Id.*) Claimant was diagnosed with diabetes, hypertension, hyperlipidemia, and anxiety. (Tr. at 456). She was advised to keep an appointment with her psychiatrist and quit smoking. (*Id.*)

In September 2011, Claimant followed up with Dr. Chand for her right elbow. (Tr. at 465). Dr. Chand noted that Claimant's gait was within normal limits. (*Id.*) Claimant's mental status was clear with appropriate mood. (*Id.*)

On October 27, 2011, Claimant presented to Bluefield Internal Medicine for a follow-up appointment. (Tr. at 761). The examiner recorded that Claimant had a normal gait and station. (*Id.*) Claimant was diagnosed with diabetes mellitus Type 2, hypertension, headache, and GERD. (*Id.*) She was to remain on her medication regimen with the exception of changing Voltaren to Codeine. (*Id.*)

Dr. Chand examined Claimant on November 8, 2011 in preparation for carpal tunnel surgery. (Tr. at 643). Claimant reported experiencing weakness, cold feet/hands, anxiety, dizziness, numbness/tingling, headaches, depression, and circulation problems. (*Id.*) Dr. Chand performed an open method right carpal tunnel release on November 18, 2011. (Tr. at 645). Claimant's postoperative diagnosis was carpal tunnel syndrome on the right side. (*Id.*)

On December 1, 2011, Claimant presented to the Bluefield Regional Medical Center for an x-ray of her knees. (Tr. at 677-78). The x-ray of Claimant's left knee revealed mild degenerative changes with no acute process. (Tr. at 677). The x-ray of Claimant's right knee showed degenerative changes with no acute osseous process. (Tr. at 678).

Claimant returned to Dr. Chand on December 6, 2011 for a follow-up to her

surgery. (Tr. at 647-49). Dr. Chand noted that the results from the operation were good. (Tr. at 649). Claimant's treatment plan included physical therapy and Lortab. (Tr. at 649).

Claimant visited Sanjay R. Mehta, D.O., on January 26, 2012, for diabetic care. (Tr. at 763). Upon examination, Claimant was alert and oriented with trace edema in her lower extremities bilaterally. (*Id.*) Claimant was advised to work on following a diabetic diet. (*Id.*) Dr. Mehta increased Claimant's Humalog 75/25 dosage and continued her on Fioricet. (*Id.*) He also added sulindac 200 mg and Tramadol. (*Id.*) Dr. Mehta informed Claimant that she needed to work on her diet and lose weight. (*Id.*)

Claimant was referred to Samar Sankari, M.D., on May 1, 2012, for poorly controlled diabetes. (Tr. at 695). Claimant reported financial issues that impacted her diet and prevented her from consistently eating well. (*Id.*) Dr. Sankari observed that Claimant was oriented and in no acute distress. (Tr. at 695). Dr. Sankari found that Claimant's extremities exhibited good pulses and no edema. (Tr. at 696).

On July 12, 2012, Claimant returned to Dr. Mehta. (Tr. at 769). She told Dr. Mehta that she felt much better overall. (Tr. at 769). Claimant reported recently losing nine pounds. (*Id.*) She complained of numbness, burning, tingling, and heaviness in her feet; otherwise, the review of systems was unremarkable. (*Id.*) She informed Dr. Mehta that Neurontin was very helpful in treating her neuropathy. (*Id.*) Upon examination, Claimant was in no acute distress, and no clubbing, cyanosis, or edema were noted in her extremities. (*Id.*)

Dr. Chand examined Claimant on August 14, 2012 for complaints of pain in her left elbow along with numbness and tingling. (Tr. at 717). Her mental status examination was clear with appropriate mood. (Tr. at 719). Claimant underwent an

anterior ulnar nerve transposition and a medial epicondylectomy of the left elbow on August 17, 2012. (Tr. at 720). She returned to Dr. Chand on August 28, 2012, and he noted that Claimant was making good recovery from the surgery. (Tr. at 754).

On October 11, 2012, at a follow-up appointment after elbow surgery, Claimant reported to Dr. Chand that she experienced pain in her knees. (Tr. at 756-57). Dr. Chand observed that Claimant's mental status was clear with appropriate mood. (Tr. at 758). Claimant's gait and neurologic function were normal. (*Id.*)

Dr. Mehta examined Claimant on January 8, 2013, noting that her blood sugar was not well controlled. (Tr. at 772). Claimant reported nausea, tremor, anxiety, generalized ache, and decreased sensation in her feet. (*Id.*) She was counseled on diet and exercise. (*Id.*)

On April 22, 2013, Claimant presented to Community Radiology of Virginia for a Duplex Doppler ultrasound of her bilateral extremities due to complaints of pain and swelling. (Tr. at 891). The testing revealed no evidence of deep vein thrombosis involving major veins in either lower extremity. (*Id.*)

**B. Evaluations and Opinions**

On June 3, 2011, Bob Marinelli, Ed.D., completed a Mental Residual Functional Capacity Assessment. (Tr. at 413-15). In connection with understanding and memory, Dr. Marinelli found that Claimant was not significantly limited in her ability to understand and remember very short, simple instructions; however, she was moderately limited in her ability to remember locations and work-like procedures, as well as understand and remember detailed instructions. (Tr. at 413). In the area of concentration and persistence, Dr. Marinelli opined that Claimant was not significantly limited in her ability to carry out very short and simple instructions, maintain attention

and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions. (*Id.*) Claimant was moderately limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 413-14). As to social interaction, Dr. Marinelli determined that Claimant was not significantly limited in her ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. at 414). Claimant was found to be moderately limited in her ability to interact appropriately with the general public as well as get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) She was not significantly limited in adaptation, with the exception of being moderately limited in her ability to set realistic goals or make plans independently of others. (*Id.*) Dr. Marinelli opined that Claimant's mental RFC was reduced by moderate limitations in memory, sustained persistence, social functioning, and judgment. (Tr. at 415). He concluded that Claimant had the capacity to sustain routine and gainful work-related activities involving short, simple instructions with low pressure, social, and judgment demands. (*Id.*) On December 28, 2011, Chester Frethiem, Psy.D., reviewed the available records and affirmed Dr. Marinelli's June 2011 assessment. (Tr. at 614).

On August 19, 2011, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 441-48). Dr. Franyutti noted that Claimant's alleged impairments included diabetes mellitus, peripheral neuropathy, carpal tunnel syndrome, atypical chest pain, depression, high blood pressure, overactive balder, brittle bones, and back problems. (Tr. at 441, 448). As to exertional limitations, Dr. Franyutti determined that Claimant could occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, or sit six hours in an eight-hour workday. (Tr. at 442). Claimant was unlimited in her ability to push and pull. (*Id.*) With respect to postural limitations, Dr. Franyutti determined that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; however, she could never climb ladders, ropes, or scaffolds. (Tr. at 443). Dr. Franyutti opined that no manipulative, visual, or communicative limitations were established. (Tr. at 444-45). As for environmental limitations, Claimant could have unlimited exposure to wetness, humidity, and noise; however, Dr. Franyutti asserted that she should avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery or heights. (Tr. at 445). In support of his opinion, Dr. Franyutti summarized medical records from Dr. Horwitz, Dr. Siegel, Dr. Razzaq, Princeton Community Hospital, and Dr. Mehta. (Tr. at 448). Dr. Franyutti also noted that Claimant's activities of daily living included independent self-care, some limited mobility, light household chores with assistance from others, shopping, running errands, and using public transportation. (*Id.*) Dr. Franyutti opined that Claimant was partially credible. (*Id.*) On December 14, 2011, A. Rafael Gomez, M.D., reviewed Dr. Franyutti's assessment and indicated that Claimant had been reduced to light work. (Tr. at 613). In reviewing the assessment, Dr. Gomez considered new information concerning Claimant's surgery for

carpal tunnel syndrome. (*Id.*) Nonetheless, Dr. Gomez opined that this new information did not alter Claimant's physical RFC. (*Id.*)

George Walker, M.D., completed a Case Analysis on May 21, 2012. (Tr. at 679). Dr. Walker took note of Claimant's podiatry records as well as results of knee x-rays that revealed mild degenerative joint disease with narrowing in two compartments on the right and left knees. (*Id.*) He also reviewed an August 2011 physical therapy record noting that Claimant's grip strength measured thirty pounds on the right and fifty-five pounds on the left. (*Id.*) In addition, Dr. Walker reviewed the results of Claimant's carpal tunnel release surgery. (*Id.*) Dr. Walker did not give significant weight to the examinations of non-podiatric areas. (*Id.*) He recorded that Claimant was nearly morbidly obese with non-quantified left knee degenerative joint disease and that there was no recent gait description in the file. (*Id.*) Dr. Walker concluded that the medical record was insufficient to rate Claimant's case. (*Id.*)

On August 23, 2012, Dr. Horwitz wrote a letter stating that Claimant experienced severe diabetic neuropathy and arthritic pain that prevented her from working. (Tr. at 736). He opined that she was unable to stand, sit, or walk for more than thirty minutes. (*Id.*) He concluded that her medical conditions rendered her completely disabled. (*Id.*)

On September 24, 2012, Dr. Horwitz completed a series of interrogatories related to his treatment of Claimant. (Tr. at 746-47). Dr. Horwitz confirmed that he had treated Claimant forty-four times from July 15, 2010 to September 12, 2012 for a diagnosis of plantar fasciitis of both feet; osteoarthritis, degenerative joint disease of the feet and ankles; diabetes with arthritic and neurological manifestations; diabetic polyneuropathy; Morton's neuroma; and chronic foot and ankle instability due to ligament laxity. (Tr. at 746). Dr. Horwitz asserted that Claimant's conditions caused an

inability to stand or walk for any length of time. (*Id.*) In addition, Dr. Horwitz stated that Claimant's conditions caused pain on walking or standing as well as an unsteady gait due to ligament laxity. (*Id.*) As such, Claimant was at risk for spasms and falls. (*Id.*) In response to a question asking whether Claimant could perform sedentary work, Dr. Horwitz answered that Claimant could not safely carry or lift ten pounds nor could she stand for any length of time due to her ligament laxity. (Tr. at 747). Dr. Horwitz also noted that Claimant's diabetic neuropathy and plantar fasciitis would cause pain while sitting or standing. (*Id.*) Dr. Horwitz concluded that Claimant's symptoms resulted in total and permanent disability. (Tr. at 746-47).

On June 16, 2012, Claimant was referred by her counsel to L. Andrew Steward, Ph.D., for a Psychological Evaluation. (Tr. at 680-88). Claimant was appropriately talkative with good rapport established. (Tr. at 680). Dr. Steward noted that Claimant cried during the evaluation. (*Id.*) He opined that Claimant made a diligent effort on tests and concluded that the results of the evaluation were valid and reliable. (Tr. at 680-81). Dr. Steward observed that Claimant's affect was constricted with some lability and that her mood was anxious and dysphoric. (Tr. at 681). Her thought content and organization were poor, but not confused. (*Id.*) Dr. Steward recorded that Claimant's fund of knowledge, judgment, abstract reasoning, ability to perform calculations, attention, and concentration were significantly depressed. (*Id.*) Claimant's immediate, recent, and remote memory was slightly depressed. (*Id.*) Claimant reported that she experienced anxiety and depression since her first marriage in 2007 and that her symptoms had worsened after that time. (*Id.*) She indicated that she could not tolerate crowds or noise and that children sometimes bothered her. (*Id.*) She reported having a nervous breakdown in the third grade. (Tr. at 681-82). She also described past suicidal

thoughts, but no suicide attempts. (Tr. at 682). Although Claimant was not homicidal, she indicated wanting to sometimes choke people. (*Id.*) Claimant informed Dr. Steward that she experienced sleep issues, racing thoughts, crying episodes, emotional eating, and feelings of worthlessness, hopelessness, and helplessness. (*Id.*) Claimant stated that she spent her time doing laundry, wiping things, cleaning, and watching television. (*Id.*) She seldom had visitors and did not drive. (*Id.*) Dr. Steward noted that Claimant was not involved with any clubs or churches and that her hobby was crocheting. (*Id.*)

At the evaluation, Dr. Steward administered a series of tests. On the Wechsler Adult Intelligence Test, Fourth Edition, Claimant achieved a seventy-four in verbal comprehension, ninety-eight in perceptual reasoning, eighty-nine in working memory, and eighty-four in processing speed. (Tr. at 684). Claimant's full scale IQ score was eighty-two. (*Id.*) Dr. Steward concluded that Claimant's full scale IQ score placed her in the borderline intellectual functioning range. (Tr. at 685). Claimant's verbal comprehension and processing speed scores fell within the borderline intellectual functioning range; however, her perceptual reasoning and working memory scores fell within the average range of intellectual ability. (*Id.*) On the Beck Anxiety Inventory, Claimant scored a thirty, which indicated severe anxiety. (Tr. at 684). On the Beck Depression Inventory, Second Edition, Claimant received a score of thirty-six, which represented severe depression. (*Id.*) On the Personality Assessment Inventory, Dr. Steward noted that Claimant's clinical scales were significantly elevated in the areas of somatic concerns, anxiety, anxiety related disorders, depression, paranoia, borderline tendencies, suicidal ideation, and stress. (Tr. at 686). Dr. Steward opined that Claimant's scores indicated a cry for help or extremely negative view of oneself. (*Id.*)

Based upon his evaluation and testing, Dr. Steward diagnosed Claimant with major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; and borderline intellectual functioning. (Tr. at 687). Dr. Steward assigned a GAF score of forty-eight.[5] (*Id.*) In summarizing his findings, Dr. Steward wrote that Claimant had several limitations, including a lifelong condition of borderline intellectual functioning, several medical issues, and emotional conditions of anxiety and depression that were consistent with chronic pain syndrome. (Tr. at 688). He opined that Claimant was permanently and totally disabled from any type of gainful employment for at least one year. (*Id.*) Dr. Steward concluded that Claimant's prognosis was poor in the area of behavioral gains, and he recommended that continue psychotherapeutic intervention. (*Id.*) Dr. Steward opined that she was capable of managing her own funds. (*Id.*)

That same day, Dr. Steward completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 690-92). Dr. Steward was asked to rate the severity of Claimant's limitations in performing work-related activities using a scale that ranged from no limitation to "extreme" limitation, with "slight," "moderate," and "marked" in-between. (Tr. at 690). "Slight" limitation meant that there were "some mild limitations in th[e] area, but the individual can generally function well"; "moderate" limitation meant that "the individual [was] still able to function satisfactorily"; "marked" limitation meant that there was "serious limitation in th[e] area" with "severely limited but not precluded" ability to function in the area; and "extreme" limitation meant that there was "major limitation" with "no useful ability to function" in the area. (*Id.*) Dr.

_____

[5] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV at 34.

Steward opined that Claimant was moderately limited in her ability to remember locations and work-like procedures; understand, remember, and carry out short, simple instructions; sustain an ordinary routine without special supervision; and make simple work-like decisions. (Tr. at 690). He found that Claimant was markedly limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual; and work with or near others without being distracted by them. (*Id.*) In addition, Dr. Steward determined that Claimant was extremely limited in her ability to complete a normal workday or workweek and perform at a consistent pace. (*Id.*) With respect to social interaction and adaptability, Dr. Steward indicated that Claimant was moderately limited in her ability to interact appropriately with co-workers and respond appropriately to changes in a routine work setting; however, Claimant was markedly limited in her ability to respond appropriately to work pressures in a usual work setting and interact with the public and supervisors. (Tr. at 691). In support of his opinions, Dr. Steward cited the psychological test results from his evaluation of Claimant, which revealed that Claimant suffered from borderline intellectual functioning, depression, and anxiety. (*Id.*)

On March 5, 2013, Dr. Riaz completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 827-29). The form contained the same rating scale as that completed by Dr. Steward. (Tr. at 827). Dr. Riaz opined that Claimant was moderately limited in her ability to understand, remember, and carry out short, simple instructions and make simple work-related decisions. (*Id.*) He further determined that Claimant was markedly limited in her ability to remember directions and work-like procedures; understand, remember, and carry out detailed instructions;

maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; complete a normal workday or workweek; and perform at a consistent pace. (*Id.*) Dr. Riaz based his opinion on Claimant's inability to concentrate and report of panic attacks when in crowds. (Tr. at 828). As to social interaction and adaptability, Dr. Riaz concluded that Claimant was markedly limited in her ability to interact appropriately with the public, supervisors, and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. (*Id.*) Dr. Riaz supported his determination by citing Claimant's depressed mood and frequent panic attacks. (*Id.*) Dr. Riaz also noted that Claimant was taking multiple medications to treat her depression and anxiety. (*Id.*) He opined that Claimant's complaints were credible and that she would miss work more than three times each month due to her impairments or treatment. (Tr. at 829).

On March 11, 2013, Dr. Horwitz completed a disability verification form directed to the Bluefield Housing Authority. (Tr. at 845). He indicated that Claimant was disabled due to C-fiber pain in her feet, chronic foot and ankle instability causing an altered gait, diabetic neuropathy, and Tarsal tunnel syndrome in both feet. (*Id.*) Dr. Horwitz opined that Claimant was a high risk for falls. (*Id.*)

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a

*de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v.*

*Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed

applicable Regulations and Rulings in reaching his decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence

exists, the Court must affirm the Commissioner's decision "even should the court

disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

### A. The ALJ's Evaluation of Opinion Evidence

Claimant's first two challenges relate to the ALJ's evaluation of the medical

source statements. Claimant believes that the ALJ incorrectly weighed the opinions

provided by Dr. Horwitz, Dr. Riaz, and Dr. Steward, (ECF No. 14 at 4-12), and likewise

erred in assigning any weight to the opinions of the state agency medical consultants.

(*Id.* at 12-13). When evaluating a claimant's application for disability benefits, the ALJ

"will always consider the medical opinions in [the] case record together with the rest of

the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical

opinions are defined as "statements from physicians and psychologists or other

acceptable medical sources that reflect judgments about the nature and severity of [a

claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what

[he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6),[6] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."

---

[6] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence.[7] *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and

---

[7] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Beginning with Dr. Horwitz's opinion, the ALJ recognized that Dr. Horwitz had been Claimant's treating podiatrist for over two years. (Tr. at 50-51). The ALJ discussed Claimant's first visit with Dr. Horwitz in July 2010 at which Claimant reported decreased sensation in her feet and instability in some of her bilateral lower extremity joints. (Tr. at 50). Claimant was prescribed medication and orthopedic insoles, and Dr. Horwitz administered nerve block injections. (*Id.*) The ALJ pointed out that Claimant reported improvement throughout 2010 and that Dr. Horwitz recorded similar findings on physical examinations at later appointments that year, which suggested that Claimant's condition was stable. (Tr. at 50-51). The ALJ also analyzed the treatment records prepared by Dr. Horwitz in 2011, noting Claimant's statement that her feet were "doing fine" as long as she was using medication and receiving injections. (Tr. at 51). The ALJ pointed out Claimant's statements to Dr. Horwitz in 2011 and 2012 that her

"treatment helped appreciably." (*Id.*) In addition, Claimant reported in March 2012 that her feet were "doing good." (*Id.*) While Claimant had consistently complained of moderate pain, she described the pain as "not really bad … just aggravating" in May 2012. (*Id.*) Claimant subsequently indicated that her pain was now mild, and she was doing better. (*Id.*) The ALJ mentioned that Claimant reported her feet feeling "a little heavy" in March 2013, but Claimant also confirmed that the prescribed treatment was helping. Dr. Horwitz's examination findings at that appointment were similar to previous visits. (*Id.*) Overall, the ALJ found that Claimant's foot pain was controlled with conservative treatment and that she did not require surgery on her feet. (Tr. at 53).

After summarizing Dr. Horwitz's treatment records, the ALJ discussed Claimant's daily activities and additional medical records wherein Claimant's other health care providers described her gait as normal. (Tr. at 51-54). In summarizing Claimant's daily activities, the ALJ stressed that Claimant lived alone and was able to independently take care of her personal needs. (Tr. at 53). Claimant also reported performing chores, cleaning her home, traveling out of state, and using the public bus system, which required walking to and from bus stops. (Tr. at 53-54).

The ALJ then turned to Dr. Horwitz's opinions. (Tr. at 54). The ALJ indicated that Dr. Horwitz had opined in both 2012 and 2013 that Claimant was disabled.[8] (*Id.*) In addition, Dr. Horwitz felt that Claimant was unable to stand or walk for any length of time and that Claimant's unstable gait placed her at a higher risk for experiencing sprains and falls. (*Id.*) The ALJ assigned little weight to these opinions, explaining that they were not supported by the medical evidence, including Dr. Horwitz's own

---

[8] The Commissioner correctly points out that this opinion encompassed an issue reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2.

treatment notes and the observations of Claimant's other health care providers. (*Id.*) As an example, the ALJ noted that although Dr. Horwitz had documented some joint laxity, he never concluded that it caused gait instability, and he never instructed Claimant to limit standing and walking. (*Id.*) In addition, the ALJ commented on Claimant's statements to Dr. Horwitz that her pain was moderate, but improved with treatment, and eventually decreased to mild for a time. (*Id.*) Furthermore, the ALJ stressed that other providers had consistently described Claimant's gait as normal, and she had not suffered any serious falls or sprains due to instability. (*Id.*) Later in the RFC discussion, the ALJ addressed the opinions of Dr. Franyutti and Dr. Gomez that Claimant could stand and walk for six hours in an eight-hour workday. (Tr. at 55). The ALJ assigned some weight to their opinions because they possessed "a high level of understanding of the Social Security disability program and enjoyed a review of all the available evidence in the record when forming their opinions." (Tr. at 55-56).

Having reviewed the record, the undersigned **FINDS** that the ALJ provided a number of good reasons for assigning little weight to Dr. Horwitz's opinions and those reasons are supported by substantial evidence. First, although Claimant argues that the ALJ failed to address specific treatment records from Dr. Horwitz that conflicted with his opinion, it is clear from the written decision that the ALJ's findings were based upon a thorough assessment of Dr. Horwitz's treatment records, which the ALJ had summarized earlier in the decision. Claimant consistently reported throughout her treatment relationship with Dr. Horwitz that medications, orthopedic insoles, and foot injections improved her pain and allowed her better use of her feet. (Tr. at 50-51, 53-54, 511, 515, 517, 520, 523, 531, 534, 537, 540, 544, 547, 554, 571, 574, 578, 582, 588, 592, 595, 626, 660, 664, 668-69, 724, 732, 791, 798, 806). As the ALJ pointed out, Dr.

Horwitz's findings at many of the examinations were similar, indicating that Claimant's condition was stable. (Tr. at 51, 583, 635, 730, 733, 795, 833). Occasionally, Dr. Horwitz noted improvement in neurological or musculoskeletal examination findings. (*See, e.g.*, Tr. at 512, 545, 548, 586, 588-89, 593, 596, 610, 622-23, 627, 670). Moreover, Dr. Horwitz regularly described Claimant's prognosis as fair, hopeful, or good. (*See, e.g.*, Tr. at 391, 377, 532, 536, 576, 580, 600, 620, 739, 834). In addition, as the ALJ observed, Claimant's treatment with Dr. Horwitz was rather conservative. Although Claimant was referred for a surgical consult related to her foot problems, it is does not appear that she ever attended, and there is no evidence that she ever required surgery on her feet. (Tr. at 53, 603). While the ALJ arguably placed too much emphasis on the absence of the phrase "gait instability" in Dr. Horwitz's treatment records, particularly given Dr. Horwitz's repeated diagnosis of foot and ankle instability, the ALJ properly pointed out that Dr. Horwitz did not specifically instruct Claimant to limit her walking or standing.[9] (Tr. at 54). Furthermore, Claimant was often described as ambulatory at her appointments with Dr. Horwitz. (Tr. at 368, 505, 511, 578, 582, 595, 618, 798, 802).

Second, the ALJ correctly emphasized that Claimant's other health care providers consistently described her gait as normal. (Tr. at 50-52, 54). Specifically, Claimant's gait was described as normal in July 2010, September 2010, November 2010, July 2011, September 2011, October 2011, and October 2012. (Tr. at 408, 425, 430, 465, 469, 758, 761).

Third, the ALJ rightly noted that there was no evidence that Claimant had suffered any serious falls or sprains due to gait instability. (Tr. at 54). While Claimant

---

[9] Dr. Horwitz did advise Claimant to limit her activities to those that produced minimal discomfort. (Tr. at 380).

indicated in a May 2011 Adult Function Report that she used a non-prescribed cane to ambulate, only one medical record from March 2011 mentions Claimant's report of "intermittently" using a cane. (Tr. at 265, 347). Claimant also indicated to Dr. Horwitz in March 2013 that she had been using a walker to ambulate, which Dr. Horwitz recommended she continue to do. (Tr. at 834). However, the walker was apparently non-prescribed, and there is no medical documentation in the record establishing when Claimant began using a walker. Indeed, Dr. Horwitz's note is the single reference in the record to Claimant using a walker. Furthermore, at the administrative hearing, Claimant did not testify to using a walker or any assistive device when explaining her difficulty with ambulation. (Tr. at 73-74). Additionally, as noted above, Dr. Horwitz often observed that Claimant was ambulatory without adding any caveat related to an assistive device.

Fourth, the ALJ appropriately noted that Dr. Franyutti's and Dr. Gomez's opinions supported a finding that Claimant could perform the requirements of light work, including standing or walking for six hours in an eight-hour day. (Tr. at 55). In arriving at his functional limitations opinion, Dr. Franyutti specifically summarized two records from Claimant's treatment with Dr. Horwitz and noted Dr. Horwitz's diagnoses. (Tr. at 448). Although Claimant insists that Dr. Franyutti only had access to "the first two treatment notes of Dr. Horwitz," (ECF No. 14 at 12), it appears that Claimant is incorrect. The two records outlined by Dr. Franyutti were from January and May 2011; Claimant had been treating with Dr. Horwitz since July 2010. (Tr. at 505). To the extent that Claimant argues Dr. Franyutti's and Dr. Gomez's opinions were entitled to no weight because Dr. Franyutti and Dr. Gomez did not have access to all of the medical evidence, and thus could not be used to counter Dr. Horwitz's opinion, that position is

unconvincing. The treatment records prepared by Dr. Horwitz after May 2011 demonstrate that Claimant's symptoms and prognosis remained stable or improved; therefore, Claimant cannot and has not identified any treatment records created after Dr. Franyutti and Dr. Gomez formed their opinions that reasonably would have altered their conclusions. Had Dr. Horwitz's records reflected significant change over the course of his treatment relationship with Claimant, or documented a later key event that marked a substantial alteration in her condition, then Claimant's argument would have merit. *See Fraley v. Astrue*, 2:10-CV-00762, 2011 WL 2681647, at *7 (S.D.W.Va. July 11, 2011) (finding that ALJ erred in relying on state agency medical source opinion formed before "key medical evidence" related to claimant's impairments was available). However, the records supplied by Dr. Horwitz, when viewed longitudinally, show a steady course with similar complaints, and a demonstrated relief of symptoms with conservative treatment.

This Court has rejected a similar claim in the past. *See Starcher v. Colvin*, No. 1:12-01444, 2013 WL 5504494, at *7 (S.D.W.Va. Oct. 2, 2013). In *Starcher*, the Court found no merit in an argument that state agency medical consultant opinions should be afforded no weight "because they were formulated before the majority of evidence was available." *Id.* In support of its reasoning, the Court cited a case from the United States Court of Appeals for the Third Circuit wherein that court recognized: "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding' ... is an update

to the report required." *Id.* (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)) (ellipses and brackets in original). Thus, the timing of a consultant's opinion is not the critical issue. Whether the consultant's opinion is entitled to weight rests on whether any significant change occurred in the claimant's condition after issuance of the consultant's opinion that reasonably would affect its validity.

Finally, the ALJ emphasized in his decision that Claimant was able to perform chores, clean her home, take care of her personal needs, travel out of state, and use the public bus system to "get around town." (Tr. at 53). These activities tend to undermine an opinion that Claimant is unable "to stand or walk for any length of time." (Tr. at 746). In sum, although there may be information in the record that would allow the ALJ to assign greater weight to Dr. Horwitz's opinions, the Court is not tasked with re-weighing the evidence. Instead, the Court's responsibility is to confirm that substantial evidence exists to sustain the ALJ's finding. Here, the undersigned **FINDS** the presence of substantial evidence to support the ALJ's conclusion that Dr. Horwitz's opinions were entitled to little weight.

Turning to Dr. Riaz's opinion, the ALJ recognized that Claimant sought mental health treatment from Dr. Riaz at SHCMHC in November 2011. (Tr. at 52). Although there are two records from SHCMHC relating to November 2011, only one of those records was prepared by Dr. Riaz. (Tr. at 496-502). The initial intake form was completed by Tina Borich, a clinician in Dr. Riaz's office. However, the ALJ mistakenly attributed both November 2011 records to Dr. Riaz and concluded that Dr. Riaz had assigned Claimant a GAF score of fifty-five at that time when, in actuality, Ms. Borich was responsible for providing the GAF score. (Tr. at 500). Continuing his examination of the November 2011 SHCMHC treatment notes, the ALJ recounted that Claimant had

reported experiencing depression and that Lexapro did not seem to help. (Tr. at 52).
Claimant further indicated symptoms of anxiety, crying spells, overeating, poor sleep,
and lack of exercise (due to being "lazy"). (*Id.*) Dr. Riaz diagnosed Claimant with
depressive disorder and prescribed her three medications, including Prozac and
Trazodone. (*Id.*) The ALJ then discussed Claimant's next appointment with Dr. Riaz in
July 2012. (*Id.*) Claimant was tearful and depressed at that visit, but her appetite,
energy, sleep, and speech were normal. (*Id.*) Dr. Riaz prescribed Paxil, Effexor, Vistaril,
and Trazodone. (*Id.*) The ALJ observed that at a subsequent appointment with Dr. Riaz
in August 2012, Claimant indicated that she was no longer crying, but still experienced
some anxiety and depression. (*Id.*) Claimant's sleep, appetite, memory, and energy were
all normal at that visit, and her medication regimen remained the same. (*Id.*) At her
December 2012 appointment with Dr. Riaz, he opined that she was "doing fairly well."
(*Id.*) The ALJ noted that Claimant had no complaints of panic attacks at that
appointment. (*Id.*) As for Claimant's March 2013 appointment with Dr. Riaz, the ALJ
explained that Claimant's mental status was "mostly normal, but she had some anxiety."
(*Id.*) Dr. Riaz continued Claimant on the same medications. (*Id.*) Later in the RFC
discussion, the ALJ asserted that "routine medications" improved Claimant's depressive
disorder and anxiety disorder. (Tr. at 53). The ALJ also stressed that Claimant was never
hospitalized for her mental health issues and that she declined counseling.[10] (*Id.*)

　　　The ALJ then addressed Dr. Riaz's opinion, noting that he had "checked boxes on
a form opining" that Claimant "had marked limitations in almost all areas of

---

[10] Claimant testified that she received counseling at some point, but she did not feel that it was working
because she was required to talk about her past and she did not like doing that. (Tr. at 87). The ALJ also
found that Claimant had failed to consistently take her psychiatric medication until July 2012. (Tr. at 52-
53). However, it is unclear how the ALJ reached this conclusion. The only medical record cited in support
of the ALJ's finding appears to indicate that Claimant reported her medication was not working, not that
she was failing to take it. (Tr. at 52, 707).

functioning." (Tr. at 54). In addition, the ALJ acknowledged that Dr. Riaz "wrote a few words about" Claimant's diagnoses. (*Id.*) The ALJ found that Dr. Riaz's opinion was entitled to little weight because it was not supported by the medical evidence, including Dr. Riaz's own treatment notes. (*Id.*) The ALJ emphasized the GAF score of fifty-five at Claimant's November 2011 intake appointment. (*Id.*) The ALJ went on to assert that Claimant's mental health improved once she consistently took her medications and attended appointments. (*Id.*) Furthermore, the ALJ mentioned that Dr. Riaz opined that Claimant was markedly impaired in her ability to concentrate and remember directions or procedures even though Dr. Riaz often recorded that Claimant's concentration and memory were not problematic. (*Id.*) Moreover, the ALJ indicated that "a check list of residual functional capacity is in itself entitled to little weight when not accompanied by medical examinations or reports of clinical findings supporting the opinion, or a rationale." (*Id.*) Finally, the ALJ noted that Dr. Marinelli and Dr. Frethiem both opined that Claimant was no more than moderately limited in all areas of mental functioning. (Tr. at 55).

Notwithstanding the ALJ's mistake of linking the GAF score of fifty-five to Dr. Riaz, rather than to his clinician, the undersigned **FINDS** that the ALJ supplied good reasons for assigning little weight to Dr. Riaz's opinions and that those reasons are supported by substantial evidence. First, the ALJ correctly noted that the medical evidence, including the records from Dr. Riaz's office, did not support the severity of limitations contained in Dr. Riaz's RFC assessment. (Tr. at 54). Indeed, Dr. Riaz's opinions conflicted with his own notations. For instance, Dr. Riaz opined that Claimant was markedly limited in her ability to remember directions or work-like procedures; yet, Dr. Riaz consistently recorded that Claimant's recent and remote memory was fair or

good. (Tr. at 496, 707, 826-27, 842). Another example—Dr. Riaz concluded that Claimant was markedly limited in her ability to interact with others; however, Claimant was often described as cooperative at her appointments, and in December 2012 and March 2013, Dr. Riaz noted that Claimant interacted well. (Tr. at 496, 707, 826, 828, 842). Moreover, Claimant's symptoms seemed to improve with treatment. (Tr. at 54). In July 2012, Claimant's appetite and sleep had improved since her last visit, and in August 2012, Claimant reported that she was experiencing fewer crying episodes. (Tr. at 707, 709). In December 2012, Dr. Riaz noted that Claimant was "doing fairly well." (Tr. at 826). In discussing Claimant's mental health treatment, the ALJ also appropriately noted that Claimant explicitly refused counseling for her mental health on at least one occasion. (Tr. at 53, 500).

Second, the ALJ properly emphasized that Dr. Riaz filled out a checklist form without providing much detail as to the clinical findings that supported his opinion. (Tr. at 54). Dr. Riaz provided little justification for the significant limitations that he assigned to Claimant, and the severity of his opinions do not reflect clinical findings. *See Foran v. Astrue*, No. 1:11-00185, 2012 WL 4499070, at *14 (S.D.W.Va. Sept. 28, 2012) (finding that ALJ properly declined to assign controlling weight to treating physician's opinion where treating physician filled out checklist form "unaccompanied by a detailed explanation as to why [c]laimant was so limited."); *cf. Copley v. Colvin*, No. 3:14-cv-18270, 2015 WL 4621641, at *28 (S.D.W.Va. July 10, 2015) (concluding that ALJ appropriately assigned little weight to treating physician's opinion based, in part, on treating physician's checking of boxes on form without citing clinical findings); *Newman v. Astrue*, No. 5:06-cv-00955, 2008 WL 4298550, at *7 (S.D.W.Va. Sept. 18, 2008) (finding that ALJ correctly declined to assign significant weight to treating

physician's opinion contained in two-page form without explanation of clinical findings supporting opinion). Quite frankly, it is difficult to tell how Dr. Riaz arrived at his opinion given the relatively sparse notes in his treatment records and on the assessment form.

Third, the ALJ acknowledged that Claimant did not seek treatment from Dr. Riaz for a period of approximately seven months between November 2011 and July 2012. (Tr. at 52). As the ALJ explained elsewhere in his RFC discussion, typically one would expect a claimant to seek treatment for an allegedly disabling impairment on a consistent basis. (Tr. at 53). Finally, the severe limitations found by Dr. Riaz were at odds with the opinions of Dr. Marinelli, and more importantly, the opinions of Dr. Frethiem, who affirmed Dr. Marinelli's assessment after reviewing the available record in December 2011 (one month after Claimant began treatment with Dr. Riaz). (Tr. at 55). Overall, the ALJ's conclusion that Dr. Riaz's opinion was entitled to little weight is supported by substantial evidence as Dr. Riaz's treatment notes fail to corroborate his opinion and he neglected to explain the clinical findings forming the basis for his opinion.[11]

In discussing Dr. Steward's opinion, the ALJ noted that Claimant was referred to Dr. Steward by her attorney for a psychological evaluation, "even though she was already being treated by a psychiatrist and had declined counseling services offered to her." (Tr. at 55). The ALJ commented that Claimant had not "recently" followed-up with Dr. Riaz at the time of her evaluation by Dr. Steward. (Tr. at 55). Claimant cried during

---

[11] While the ALJ did not specifically cite this evidence, the undersigned also sees that Claimant reported she was able to follow written and verbal instructions "well," get along with authority figures "very well," and handle changes in routine "well." (Tr. at 264-65). She further indicated that she had never been terminated from a job due to problems getting along with other people. (Tr. at 265). These statements tend to conflict with Dr. Riaz's opinion. Moreover, Dr. Riaz's opinion is odds with Claimant's statement to Ms. Borich in November 2011 that her mental health symptoms did not interfere with her performance of daily tasks and that she was only disabled by her physical health. (Tr. at 500).

the evaluation and reported experiencing feelings of depression and anxiety. (*Id.*) She also indicated that she could not tolerate crowds and was irritable when people did not clean up after themselves. (*Id.*) The ALJ noted that Dr. Steward administered a number of tests and diagnosed Claimant with depressive disorder, anxiety disorder, and borderline intellectual functioning. (*Id.*) The ALJ acknowledged that Dr. Steward assigned a GAF score of forty-eight, "which is lower than [the score assigned by] Dr. Riaz who treated the Claimant." (*Id.*) The ALJ summarized Dr. Steward's opinions, noting that he opined that Claimant was totally disabled and experienced marked limitations in her ability to perform activities within a schedule, work around others, respond to usual work pressures, and interact appropriately with others. (*Id.*) The ALJ assigned little weight to these opinions because Claimant visited Dr. Steward only once specifically to help her disability claim and not for treatment, and Claimant's statements to Dr. Steward were inconsistent with her few mental health treatment records. (*Id.*) The ALJ emphasized that Claimant had not complained of difficulty interacting with other people to Dr. Riaz or any other treating physicians. (*Id.*)

Again, the undersigned **FINDS** that the ALJ provided good reasons for discounting Dr. Steward's opinions, and those reasons are supported by substantial evidence. Preliminarily, the ALJ noted that Claimant visited Dr. Steward for a one-time evaluation after being referred by counsel, and thus, Dr. Steward was *not* a treating physician. (Tr. at 55); *see Law v. Colvin*, No. 1:13-01253, 2014 WL 4656120, at *15 (S.D.W.Va. Sept. 16, 2014) (explaining that ALJ may consider referral by attorney as one factor in evaluating opinion of examiner). Next, the ALJ appropriately took into account that Claimant had not sought psychiatric treatment in the several months preceding her evaluation with Dr. Steward, which would be expected if Claimant experienced the

severe limitations found by Dr. Steward. (*Id.*) In addition, the ALJ properly found that Dr. Steward's opinions conflicted with some of Claimant's mental health treatment records. (Tr. at 55). For example, the ALJ noted that Claimant had not reported difficulty interacting with others to her health care providers, but Dr. Steward nevertheless opined that Claimant was markedly limited in that area. (*Id.*) As Claimant points out, she did complain to Dr. Riaz in March 2013 that she suffered from panic attacks while in crowds; however, experiencing panic attacks in a crowd does not necessarily translate into a finding that Claimant suffers marked limitations in social interaction. (Tr. at 828). Indeed, Claimant stated at her evaluation with Dr. Steward that she got along with her family members and former husbands, and she also informed Ms. Borich that she regularly cared for two children belonging to a friend. (Tr. at 499, 682-83). As noted above, Claimant also previously reported getting along "very well" with authority figures and confirmed that she had never been terminated from a job due to conflicts with other people. (Tr. at 265). The severe levels of anxiety and depression noted by Dr. Steward simply are not found in the mental health records considered by the ALJ. (Tr. at 52). In addition, the ALJ noted that Claimant's mental health improved with consistent treatment. (Tr. at 52-53). Much of that treatment, including a change in medication regimen, occurred after Dr. Steward formed his opinion in June 2012. (Tr. at 707, 709, 826, 842). For these reasons, the ALJ's finding that Dr. Steward's opinion was entitled to little weight is supported by substantial evidence.

Finally, Claimant insists that the ALJ erred in assigning some weight to the opinions of the state agency medical consultants (Drs. Franyutti, Frethiem, Gomez, and Marinelli). (ECF No. 14 at 12-13). Near the conclusion of the RFC discussion, the ALJ summarized the opinions of the state agency medical consultants and conceded that

their opinions were generally not entitled to as much weight as those of examining or treating sources. (Tr. at 55-56). However, the ALJ found that the opinions deserved some weight in this case because the consultants were familiar with the Social Security disability program and able to review all of the evidence available at the time that they formed their opinions. (Tr. at 56). Moreover, the ALJ found that the consultants' opinions "deserve[d] some weight, particularly in a case such as this in which there exist a number of other reasons to reach similar conclusions as explained throughout th[e written] decision." (*Id.*) Claimant argues that the ALJ should have assigned no weight to the consultants' opinions because their opinions were based on an incomplete record. For the reasons provided in this Court's *Starcher* decision, which is summarized above, Claimant's position is unpersuasive. 2013 WL 5504494, at *7. Although Claimant contends that Dr. Marinelli did not possess any treatment records from Dr. Riaz at the time that he formed his opinion in June 2011, Dr. Marinelli likely had access to medical records from other health care providers who recorded Claimant's complaints of depression and anxiety before June 2011. (Tr. at 346, 425, 427, 451, 473). Given that Dr. Riaz's treatment records primarily contain the same complaints of depression and anxiety and a few notations of improving symptoms, Claimant is hard-pressed to show that access to Dr. Riaz's notes would have changed Dr. Marinelli's opinion.[12]

Ultimately, the undersigned **FINDS** that the ALJ's evaluation of opinion evidence complied with the regulations. Likewise, the ALJ's reasons for assigning certain opinions more weight than others are supported by substantial evidence. Although the ALJ's written discussion of the opinion evidence is not perfect (e.g.

---

[12] Moreover, Dr. Riaz's written notations are largely illegible. In any event, based upon the telefacsimile date, which is found on the November 2011 records from Dr. Riaz's office, and the date of Dr. Frethiem's case review, Dr. Frethiem had access to Claimant's November 2011 mental health treatment records at the time that he affirmed Dr. Marinelli's opinion. (Tr. at 496-503, 614).

misinterpreting some of the treatment notes from SHCMHC), ensuring perfection is not the aim of the substantial evidence test. *See, e.g., Reynolds v. Colvin*, No. 6:13-cv-22604, 2014 WL 4852242, at *21 (S.D.W.Va. Aug. 19, 2014).

### B. The ALJ's Credibility Analysis

In her third challenge to the Commissioner's decision, Claimant asserts that the ALJ erred when he found that Claimant's report of her symptoms was less than fully credible. (ECF No. 14 at 13-17). Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity,

persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility.

For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.

1984).

Here, the ALJ scrutinized Claimant's allegations of her symptoms using the two-step process required by the regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 52). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. at 52). The ALJ provided a number of reasons for assigning less than full credibility to Claimant's statements. First, the ALJ found that Claimant had not consistently complained of and sought treatment for all of her alleged impairments. (Tr. at 53). As an example, the ALJ asserted that Claimant only occasionally mentioned her lower back pain to her physicians. (*Id.*) Second, the ALJ emphasized that although Claimant alleged disabling impairments, most of her treatment tended to be "routine and/or conservative in nature." (*Id.*) For example, with respect to Claimant's feet, she received injections, took medications, and wore insoles. (*Id.*) Third, the ALJ found that Claimant had been occasionally noncompliant with her prescribed treatment. (*Id.*) The ALJ emphasized that Claimant never attended counseling and did not consistently take her psychiatric medication until July 2012. (*Id.*) He also recognized that Claimant failed to quit smoking even though her treating physicians repeatedly told her that smoking negatively affected her diabetes and other impairments. (*Id.*) In addition, the ALJ asserted that Claimant failed to attend prescribed physical therapy appointments. (*Id.*) Fourth, the ALJ cited Claimant's reported activities and found that they were not as limited as "one would expect." (Tr. at 53-54). As an illustration, the ALJ noted that Claimant reported crocheting blankets while also alleging limited use of her hands. (Tr. at 54). Finally, the ALJ determined that there was evidence that Claimant stopped

working for reasons not related to her impairments; specifically, the ALJ stressed Claimant's statement in a Disability Report that she quit working to take care of a family member. (*Id.*) Moreover, the ALJ concluded that the medical evidence demonstrated "many of [Claimant's] allegedly disabling medical problems began or worsened after she already quit working." (*Id.*)

Claimant attacks the ALJ's credibility analysis point-by-point and argues that the ALJ "cherry-picked" certain records to find inconsistencies. (ECF No. 14 at 14-16). Nonetheless, the undersigned **FINDS** that the ALJ's credibility analysis complied with the regulations and rulings, and is supported by substantial evidence. The ALJ correctly found that Claimant did not consistently seek treatment for some of her alleged impairments. For example, Claimant did not seek mental health treatment for approximately seven months after being instructed to follow-up within four weeks at her November 2011 appointment. (Tr. at 496). The ALJ was also correct that Claimant's reports of low back pain were somewhat inconsistent, which one might expect to be consistent if alleged as a disabling impairment. (Tr. at 53, 341, 435). Furthermore, the ALJ aptly pointed out that Claimant's treatment tended to be conservative, and it controlled or improved her symptoms. (Tr. at 53); *see Stitely v. Colvin*, ___ F. App'x ___, 2015 WL 4621292, at *2 (4th Cir. Aug. 4, 2015) (recognizing that conservative treatment may be used as factor in credibility analysis).

As for the ALJ's finding that Claimant was not always compliant with her prescribed or recommended treatment, there is some evidence in the record to support the ALJ's conclusion. Claimant indeed declined counseling at her November 2011 appointment with Ms. Borich, although she claims that she attended counseling, but it did not help. In addition, Claimant never quit smoking although repeatedly advised to

do so, which can be considered in the credibility analysis. (Tr. at 405, 456); *see Pearson v. Colvin*, No. 2:14-CV-26, 2015 WL 3757122, at *36 (N.D.W.Va. June 16, 2015); *Mills v. Colvin*, No. 3:13-cv-06421, 2014 WL 1767698, at *14 (S.D.W.Va. May 2, 2014); *Ceasar v. Comm'r of Soc. Sec.*, No. 1:12-cv-548, 2013 WL 3567040, at *12 (S.D. Ohio July 11, 2013); *Douglas v. Comm'r of Soc. Sec.*, No. 6:11-cv-00043, 2012 WL 5929322, at *5 (W.D. Va. Nov. 7, 2012), *report and recommendation adopted by* 2012 WL 5941469 (W.D. Va. Nov. 27, 2012); *cf. Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984) ("The Secretary may only *deny the claimant benefits* because of ... tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop.") (emphasis added). Moreover, Claimant does not appear to dispute the ALJ's finding that she did not attend prescribed or recommended physical therapy appointments. Instead, Claimant accuses the ALJ of "ambush[ing]" her in the written decision and insists that she could not have known that "compliance was an issue without reading [the ALJ's] mind." (ECF No. 14 at 16). However, the ALJ asked a straightforward question at the administrative hearing: "Have you followed all of your doctor's [*sic*] advice and recommendations?" (Tr. at 78). Claimant responded, "Yes, I have." (*Id.*) Far from being ambushed, Claimant was given the opportunity to admit and explain any noncompliance with treatment at the hearing; however, rather than provide full and correct information, Claimant chose to give a misleading answer that benefited her claim.

The ALJ also appropriately determined that Claimant's credibility was undermined to some extent by her statement that she stopped working, in part, because her father was diagnosed with cancer and she had to take care of him, and her later testimony at the administrative hearing that she stopped working due to her "illness,"

without mention of her father. (Tr. at 71-72, 310). Finally, the ALJ aptly noted in his credibility analysis and throughout the RFC discussion that some of the medical evidence belied Claimant's reported symptoms. For example, Claimant reported severe limitations in walking and standing, but as discussed above, her gait was often found to be normal. (Tr. at 53). Overall, the undersigned **FINDS** that the ALJ's credibility determination is supported by substantial evidence.

### C. The ALJ's RFC Finding

In her final challenge, Claimant contends that the ALJ's RFC analysis is deficient. More particularly, Claimant argues that the ALJ used his own non-expert knowledge in arriving at the RFC finding and incorporated his personal opinions into Claimant's RFC rather than the opinions of treating, examining, and non-examining medical sources. (ECF No. 14 at 17-18). By way of example, Claimant cites Dr. Marinelli's opinion that Claimant would be limited to work involving short and simple instructions with low pressure, social, and judgment demands. (*Id.* at 18; Tr. at 415). Claimant takes issue with the ALJ's failure to incorporate limitations with respect to low pressure, social, and judgment demands into the RFC finding. (ECF No. 14 at 18).

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the

relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the claimant's

RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

As to Claimant's argument that the ALJ used his own non-expert knowledge to formulate Claimant's RFC, the United States Court of Appeals for the Fourth Circuit and this Court have recognized that the RFC assessment is an administrative finding rather than a medical finding.[13] *Felton-Miller v. Astrue*, 459 F. App'x 226, 230-21 (4th Cir. 2011) (stating that RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record.") (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *Youkers v. Colvin*, No. 3:12-9651, 2014 WL 906484, at *10 (S.D.W.Va. Mar. 7, 2014); *Starcher*, 2013 WL 5504494, at *8. Accordingly, an ALJ is **not** required to obtain an expert medical opinion as to a claimant's RFC. *Felton-Miller*, 459 F. App'x at 230-31; *Hucks v. Colvin*, No. 2:12-cv-76, 2013 WL 1810658, at *9 (N.D.W.Va. Apr. 3, 2013), *report and recommendation adopted by* 2013 WL 1810656 (N.D.W.Va. Apr. 29, 2013); *see also Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."); *Sullivan v. Comm'r of Soc. Sec.*, No. 2:13-cv-1460-KJN, 2014 WL 6685075, at *4 (E.D. Cal. Nov. 25, 2014) ("It is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source."); *Mitchell v. Comm'r of Soc. Sec.*, No. SAG-12-3332, 2013 WL 5182801, at *1 (D. Md. Sept. 12, 2013) ("An ALJ need not parrot a single medical

---

[13] In contrast, the United States Court of Appeals for the Eighth Circuit has held that the RFC assessment is a medical question. *See, e.g., Martise v. Colvin*, 641 F.3d 909, 923 (8th Cir. 2011).

opinion, or even assign 'great weight' to any opinions, in determining an RFC."); *Thomas v. Colvin*, No. 12-227-N, 2013 WL 1218920, at \*8 (S.D. Ala. Mar. 25, 2013) (recognizing that RFC determination need not be supported by specific medical opinion); *Town v. Astrue*, No 3:12cv105, 2012 WL 6150836, at \*4 (N.D. Ind. Dec. 10, 2012) ("The determination of an individual's RFC need not be based on a medical opinion because it is a determination reserved to the ALJ as fact-finder for the Commissioner."). Instead, an ALJ must *consider* all relevant evidence in the record, including the opinions of medical sources, and arrive at a determination of a claimant's RFC that is supported by substantial evidence. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p, 1996 WL 374184, at \*5.

Here, the ALJ extensively considered the objective medical evidence, Claimant's statements, and the medical opinion evidence in arriving at the RFC finding. (Tr. at 48-56). The ALJ not only summarized this evidence in the written decision, but analyzed it and resolved any perceived conflicts within it. Despite the ALJ's assertion that he assigned only "some weight" to the state agency medical consultants' opinions, the ALJ clearly relied on those opinions in crafting Claimant's RFC; still, he was not required to adopt all of the limitations set forth in their opinions. *Starcher*, 2013 WL 5504494, at \*8 (approvingly citing Third Circuit case for proposition that ALJ is not bound to wholly adopt opinion of any medical expert). The ALJ also explained his reasons for declining to adopt other medical opinions that conflicted with the RFC finding. Overall, the undersigned **FINDS** that while the RFC discussion may not be perfect, the written decision is sufficiently clear for a subsequent reviewer to follow how the ALJ arrived at the RFC finding. Additionally, the undersigned **FINDS** that the RFC assessment is

supported by substantial evidence.[14]

## VIII. **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 14), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 15), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed

---

[14] To the extent that Claimant maintains the ALJ erred by failing to include any additional limitations contained in Dr. Marinelli's mental RFC assessment, the ALJ considered whether Claimant suffered from any limitations in social functioning and also reviewed treatment records where Claimant's judgment was often described as fair. (Tr. at 52, 54). Regardless, any error was harmless. The jobs that the ALJ found Claimant could perform require a specific vocation preparation ("SVP") level of two, which means little or no judgment is required to perform the jobs. Dictionary of Occupational Titles ("DOT") 920.685-026, 1991 WL 687929 (packer); DOT 529.687-114, 1991 WL 674763 (inspector); DOT 209.687-026, 1991 WL 671813 (mail clerk); 20 C.F.R. §§ 404.1568(a), 416.968(a) (providing that unskilled work "needs little or no judgment to do simple duties that can be learned on the job in a short period of time"); SSR 00-4p, 2000 WL 1898704, at *3 (explaining that SVP level two jobs are considered unskilled). In addition, according to the DOT, none of the three jobs requires any significant interaction with other people. Finally, at least two of the jobs identified by the ALJ do not require the ability to engage in fast-paced production. *See Tomlin v. Colvin*, No. 5:13-CV-276-D, 2014 WL 4162402, at *3 (E.D.N.C. July 17, 2014) (summarizing vocational expert's testimony that mail clerk job does not require specific production pace or work deadlines); *Mclean v. Colvin*, No. 3:11-cv-00236, 2013 WL 1826435, at *11-*12 (M.D. Tenn. Apr. 30, 2013) (recapitulating vocational expert's testimony that packer job did not require "production rate pace assembly line work"); *Jones v. Astrue*, No. 09-61470-CIV, 2010 WL 2990148, at *3 (S.D. Fla. July 8, 2010) (noting vocational expert testified that mail clerk job does not require fast pace or high production demands).

Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 17, 2015

Cheryl A. Eifert
United States Magistrate Judge